UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

----oo0oo----

UNITED STATES OF AMERICA,
ex rel. JENNIFER PUTNAM,

        Plaintiff,

    v.

EASTERN IDAHO REGIONAL MEDICAL
CENTER; EASTERN IDAHO HEALTH
SERVICES, INC.; THE BOARD OF
TRUSTEES OF MADISON MEMORIAL
HOSPITAL, a/k/a, d/b/a MADISON
MEMORIAL HOSPITAL; IDAHO FALLS
RECOVERY CENTER; MATTHEW
STEVENS; MICHELLE DAHLBERG;
SPEECH AND LANGUAGE CLINIC,
INC.; PREMIER THERAPY
ASSOCIATES, INC., a/k/a THERAPY
SERVICES, INC., a/k/a TETON
SPEECH LANGUAGE PATHOLOGY, INC.;
HCA INC., a/k/a HCA - THE
HEALTHCARE COMPANY; HCA -
MANAGEMENT SERVICES, L.P., HTI
HOSPITAL HOLDINGS, INC.; HEALTH
TRUST, INC. - THE HOSPITAL
COMPANY and DOES 1 through 50,

        Defendants.
_____/

NO. CIV. 07-192 E-BLW

MEMORANDUM AND ORDER RE:
MOTION TO DISMISS

----oo0oo----

        The False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733,
"prohibits false or fraudulent claims for payment to the United

1

1  States, 31 U.S.C. § 3729(a), and authorizes civil actions to
2  remedy such fraud to be brought by the Attorney General, §
3  3730(a), or by private individuals in the government's name, §
4  3730(b)(1)."  United States ex rel. Meyer v. Horizon Health
5  Corp., 565 F.3d 1195, 1198 (9th Cir. 2009).  When a private
6  individual--known as a Relator--initiates a qui tam action, the
7  FCA divests a court of jurisdiction over the Relator's FCA action
8  if the Relator's allegations of fraud were publicly disclosed
9  before the Relator initiated the qui tam action and the Relator
10 does not constitute an "original source" of the allegations.  31
11 U.S.C. § 3730(e)(4)(A); United States ex rel. Haight v. Catholic
12 Healthcare W., 445 F.3d 1147, 1151 (9th Cir. 2006).

13         Invoking this jurisdictional bar, defendants Michelle
14 Dahlberg and Speech and Language Clinic Inc. ("SALC")[1]  move
15 pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss
16 Relator Jennifer Putnam's qui tam action for lack of subject
17 matter jurisdiction.  Defendants specifically contend that the
18 allegations of fraud in Relator's First Amended Complaint ("FAC")
19 were publicly disclosed before she initiated this action and that
20 she is not an original source of those allegations.

21 I.   Relator's *Qui Tam* Action

22         Relator and Dahlberg are speech language pathologists
23 ("SLPs") in Idaho, and Dahlberg is the shareholder and President
24 of SALC. (Duke Aff. Ex. D at 38:17-19; Dahlberg Decl. 4-5.)  At
25 times relevant to Relator's qui tam action, Dahlberg provided

26

27         [1]    As only Dahlberg and SALC move to dismiss Relator's qui
28 tam action, the court's reference to "defendants" is limited to
   those parties.

speech language services at defendant Idaho Falls Recovery Center

("IFRC") as a subcontractor for defendant Matthew Stevens and,

ultimately, a direct subcontractor for IFRC with other SLPs

subcontracting for her.

In her FAC, Relator alleges that defendants caused

fraudulent Medicare and Medicaid claims to be submitted for

speech language services.  Specifically, the FAC alleges that

defendants used "aides to provide services to Medicare and

Medicaid patients, and knowingly and fraudulently billed both

programs for the work performed by the" aides even though

Medicare and Medicaid only cover therapy performed by SLPs.  (FAC

¶ 43.)  The FAC further alleges that defendants fraudulently

provided and sought reimbursement from Medicare and Medicaid for

speech language services that were provided in locations that

were not covered by Medicare or Medicaid, such as locations

outside of a provider hospital's financial and administrative

control.  (Id. ¶ 49.)

Relator initiated this qui tam action on April 25,

2007, and, pursuant to § 3730(b)(4), the United States

subsequently intervened.  Although defendants do not question the

court's jurisdiction over the United States' operative complaint,

they move to dismiss Relator's FAC pursuant to Rule 12(b)(1) and

the jurisdictional-bar provision of the FCA based on the alleged

public disclosure of Relator's qui tam allegations.[2]

---

[2]     Without offering additional arguments or evidence, IFRC initially joined defendants' motion to dismiss.  (Docket Nos. 162, 163.)  After Relator had filed an opposition to defendants' motion to dismiss and defendants had filed a reply, Relator filed an opposition to IFRC's motion to dismiss.  (Docket Nos. 164-

1   Specifically, defendants contend that the allegations underlying

2   Relator's qui tam action were publicly disclosed through three

3   different avenues: 1) Relator's disclosures about the alleged

4   fraud to the Idaho Department of Health and Welfare ("DHW"); 2)

5   DHW's audit of defendants and IFRC, including DHW's and IFRC's

6   communications about the audit with Relator and defendants' and

7   IFRC's employees and independent contractors; and 3) statements

8   Relator made in a deposition for a previous state court action.

9       II.  Governing Standards

10          "Federal courts are courts of limited jurisdiction" and

11  possess only the power to adjudicate cases that the Constitution

12  _____

13  166.)  Because IFRC's involvement at that point was limited to
    adopting the arguments in defendants' memorandum supporting their
14  motion to dismiss, Relator used the opposition to "respond[] to
    the arguments in Dahlberg's reply brief."  (Docket No. 166 at
15  1:13-14.)  Wanting the last word on their motion, defendants
    moved to file a response to Relator's second opposition.  (Docket
16  No. 170.)  That same day, IFRC filed a reply in which, for the
    first time, it proffered arguments and submitted evidence in
17  support of its joinder in the motion to dismiss.  (Docket No.
    171.)  Relator then opposed defendants' motion to file a response
18  and, in that motion, initially responded to the arguments in
    defendants' proposed response and IFRC's reply and requested
19  additional time to respond if the court granted defendants'
    motion to file a response.  (Docket No. 179.)  At the same time
20  she filed her opposition, Relator also filed a motion to strike
    the new arguments raised in defendants' proposed response and
21  IFRC's reply.  (Docket No. 180.)
         Mindful that the existence of the court's subject
22  matter jurisdiction awaited resolution, the court provided the
    parties with ten days to file "additional briefing and evidence
23  that is not presently before the court and is in response to any
    factual or legal argument that was omitted from an opposing
24  party's initial brief."  (Docket No. 188.)  The Order also
    provided that, "[a]fter the ten-day period for additional
25  briefing, no further briefing will be allowed, and the court will
    consider all of the arguments in and evidence submitted with the
26  parties' various briefs."  (Id.)  None of the parties filed
    additional briefing or evidence within the ten-day period.
27  Moreover, on August 5, 2009, IFRC indicated that it reached a
    settlement with the United States and Relator and withdrew its
28  joinder in defendants' motion to dismiss.

                                    4

1   and federal statutes permit.  <u>Kokkonen v. Guardian Life Ins. Co.</u>
2   <u>of Am.</u>, 511 U.S. 375, 377 (1994).  "A federal court is presumed
3   to lack jurisdiction in a particular case unless the contrary
4   affirmatively appears."  <u>Stock W., Inc. v. Confederated Tribes of</u>
5   <u>the Colville Reservation</u>, 873 F.2d 1221, 1225 (9th Cir. 1989)
6   (citing <u>California ex rel. Younger v. Andrus</u>, 608 F.2d 1247, 1249
7   (9th Cir. 1979)).

8         When considering a motion to dismiss for lack of
9   subject matter jurisdiction, a district court may properly review
10  evidence outside the pleadings to resolve factual disputes
11  concerning the existence of jurisdiction.  <u>Land v. Dollar</u>, 330
12  U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District
13  Court's jurisdiction is raised, either by a party or by the court
14  on its own motion . . . the court may inquire, by affidavits or
15  otherwise, into the facts as they exist.");  <u>see also</u> <u>United</u>
16  <u>States ex rel. Aflatooni v. Kitsap Physicians Servs.</u>, 163 F.3d
17  516, 521 (9th Cir. 1999) ("'In making its determination [about
18  jurisdiction,] the district court may resolve factual disputes
19  based on the evidence presented where the jurisdictional issue is
20  separable from the merits of the case.'");  <u>Biotics Research Corp.</u>
21  <u>v. Heckler</u>, 710 F.2d 1375, 1379 (9th Cir. 1983) (consideration of
22  material outside of the pleadings does not convert a Rule
23  12(b)(1) motion into a motion for summary judgment).  The court
24  will therefore consider the evidence the parties submitted to
25  determine whether it has jurisdiction over Relator's <u>qui tam</u>
26  action.

27        The FCA entitles relators who initiate <u>qui tam</u> actions
28  to "share in any recovery obtained on the government's behalf" in

1    an effort to encourage the uncovering of fraud against the

2    government.  Haight, 445 F.3d at 1151 (citing 31 U.S.C. §

3    3730(d)).  "At the same time, the FCA discourages opportunistic

4    qui tam relators by depriving the courts of subject matter

5    jurisdiction in actions where the fraud allegations were publicly

6    disclosed via a source listed in the provision, unless the

7    relator was the original source of the allegations."  Id.

8    Specifically, the jurisdictional-bar provision of the FCA

9    provides:

10        No court shall have jurisdiction over an action under
         this section based upon the public disclosure of
11        allegations or transactions in a criminal, civil, or
         administrative hearing, in a congressional,
12        administrative, or Government [General] Accounting Office
         report, hearing, audit, or investigation, or from the
13        news media, unless the action is brought by the Attorney
         General or the person bringing the action is an original
14        source of the information.

15   31 U.S.C. § 3730(e)(4)(A).

16        The court must therefore assess its jurisdiction in

17   light of § 3730(e)(4)(A)'s "two-tiered" inquiry.  Meyer, 565 F.3d

18   at 1199.  "If and only if" the court determines there has been a

19   public disclosure under the first inquiry, the court must then

20   determine whether the relator was the original source under the

21   second inquiry.  A-1 Ambulance Serv., Inc. v. California, 202

22   F.3d 1238, 1243 (9th Cir. 2000).  "Relators, as the qui tam

23   plaintiffs, bear the burden of establishing subject matter

24   jurisdiction by a preponderance of the evidence."  Meyer, 565

25   F.3d at 1199.

26        "Determining whether the allegations underlying a fraud

27   claim have been publicly disclosed under § 3730(e)(4)(A) itself

28   requires two inquiries."  Haight, 445 F.3d at 1151.  First, the

                                    6

court must determine whether a public disclosure originated in one of the sources enumerated in § 3730(e)(4)(A). <u>Meyer</u>, 565 F.3d at 1199. The sources, which most courts divide into three categories, include: "(1) 'a criminal, civil, or administrative hearing'; (2) 'a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation'; and (3) 'the news media.'" <u>United States ex rel. Bly-Magee v. Premo</u>, 470 F.3d 914, 917 (9th Cir. 2006). If a disclosure occurred in one of the enumerated fora, the court must then assess whether "the content of that disclosure [] consist[s] of the 'allegations or transactions' giving rise to Relators' claim." <u>Haight</u>, 445 F.3d at 1152. Although "'[t]he substance of the disclosure . . . need not contain an explicit "allegation" of fraud,'" the "'material elements of the allegedly "fraudulent transaction"'" must be disclosed in the public domain. <u>Id.</u>

III. <u>Whether Relator's Allegations of Fraud Were Publicly Disclosed</u>

   A.   <u>Relator's Disclosures to DHW</u>

       Defendants first contend that Relator's disclosures to DHW through a series of letters, faxes, and phone conversations publicly disclosed the allegations underlying her <u>qui tam</u> action. Relator's correspondence with DHW began when she reported alleged fraud by Idaho SLPs and SLP providers in a five-page letter sent to "Medicaid Fraud" on approximately September 14, 2005 ("2005 Letter"). Although Relator's 2005 Letter focused primarily on alleged fraud by Stevens, it also identified defendants as fraudulently using aides to perform therapy and billing for those services. (Wayment Aff. Ex. 12 to Ex. A. at 3-4.) The 2005

7

Letter also accused defendants of "seeing children in groups" and billing for two clients at the same time even though Dahlberg met with only one of the clients while an aide met with the other. (Id.)  As a result of Relator's 2005 Letter, Ben Johnson, an investigator within the Division of Management Services of DHW, was instructed to conduct an initial inquiry into the allegations.  (Guillon Aff. Ex. A ("Johnson Dep.") at 16:19-17:21, 86:21-87:14; id. Ex. B ("Johnson Aff.") ¶ 1.)

Approximately two months after her 2005 Letter, Relator also faxed Johnson a list of SLPs and aides whom she believed had knowledge of the alleged fraudulent practices by defendants and other SLPs.  (Wayment Aff. Ex. 3 to Ex. A.)  At some point, the DHW audit was reassigned to Brian Emfield, and Relator brought Emfield "up to speed" on the audit during a telephone conversation.  (Id. Ex. A (Putnam Dep.) at 171:13-24.)  After their conversation, Relator sent Emfield a six-page letter in January 2007 that recounted the investigations that had occurred since she sent her 2005 Letter and described the alleged fraud that had and continued to occur.  (Id. at 170:10-171:12, Ex. 2.) With respect to Dahlberg, Relator's 2007 letter to Emfield stated:

> [Dahlberg w]orked for Matt Stevens and then for Vicki Hulet until she was fired.  Obtained her own contract through [IFRC] in 2003.  She has been creatively billing since including seeing children in groups (which Medicaid does not pay for), when no service is provided, when aides provide the service, when talking to parents o[n] the phone, when writing notes.  She has also encouraged, even since the 1st audit in 2005, her therapists do the same.  On the first investigation, parents provided information to Ben. J. when Michelle took their children

8

to look at jet skis for therapy.[3]  Michelle also has a contract with the Infant Toddler Program, where complaints for fraud have occurred in the past. However, nothing formal has been done that I am aware of. . . .

(Id. Ex. 2 to Ex. A.)

In a case with similar communications, the Ninth Circuit recently held that a public disclosure did not occur when the relators presented evidence of alleged fraud to a Medicare fraud investigator.  Meyer, 565 F.3d at 1199.  The court emphasized that the disclosure of alleged fraud to a government agency does not come within one of the three public-disclosure fora provided in § 3730(e)(4)(A).  Id. at 1200.  The court further stated that, even if it created a fourth forum, "'information that was "disclosed in private"' is not a public disclosure under the [FCA], . . . even when the private disclosure is made to a government employee."  Id. (citations omitted); see also id. at 1201 n.3 ("[T]he majority of circuits that have considered the issue have concluded that disclosure to the government, without more, is not a public disclosure under § 3730(e)(4)(A)."); Seal 1 v. Seal A, 255 F.3d 1154, 1158-59 (9th Cir. 2001) (explaining that the FCA was amended in 1986 because the 1943 amendment had "led to unintended consequences, [] as it deprived courts of jurisdiction over suits in which the would-be relators had given their information to the government before filing their claims").  Accordingly, Relator's disclosures to DHW through her letters, faxes, and telephone conversations cannot

---

[3]     None of the parties suggest that Johnson publicly disclosed the allegations underlying Relator's qui tam action in his conversations with parents or patients.

constitute public disclosures under § 3730(e)(4)(A).[4]

    B.   <u>The DHW Audit</u>

       Defendants next contend that DHW's audit constituted a public disclosure under § 3730(e)(4)(A).  Although Johnson found it difficult to initially determine whether the SLPs' practices were in compliance with Medicare and Medicaid, the DHW audit ultimately revealed that some SLPs and SLP providers were improperly using aides and providing services in locations that were not covered by Medicare or Medicaid.  (<u>See</u> Johnson Dep. 24:7-26:25; Guillon Aff. Ex. A ("Gunnell Dep.") Ex. 82; Duke Aff. Exs. A, C, D ("Mar. 28, 2007 Putnam Dep.") at 47:24-48:8.)

       Under § 3730(e)(4)(A), a public disclosure can occur in an "administrative . . . audit[] or investigation."  As a threshold matter, however, the Supreme Court is currently scheduled to resolve a circuit split regarding "[w]hether an audit and investigation performed by a State or its political subdivision constitutes an 'administrative . . . audit, or investigation' within the meaning of the public disclosure jurisdictional bar of . . . § 3730(e)(4)(A)."  U.S. Supreme Court Docket, Question Presented, <u>Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson</u>, No. 08-304, <u>available at</u> http://www.supremecourtus.gov/docket/08-304.htm (granting certiorari on June 22, 2009, to hear <u>United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.</u>, 528

---

[4]    To the extent defendants argue that IFRC's Chief Executive Officer's request in November 2005 that DHW audit IFRC constituted a public disclosure (<u>see</u> Putnam Dep. at 172:17-173:4, Ex. 2 to Ex. A), <u>Meyer</u> similarly prevents this private disclosure to the government from constituting a public disclosure.

F.3d 292 (4th Cir. 2008)).  Compare, e.g., Bly-Magee, 470 F.3d at 918 ("We agree with the Eighth Circuit and now hold that the second category of sources includes non-federal reports, audits, and investigations."), with United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 746 (3d Cir. 1997) ("[W]e conclude that Congress meant to bar reliance only on 'administrative reports' originating with the federal government.").

Nonetheless, assuming that the second category of fora in § 3730(e)(4)(A) includes state administrative audits or investigations, the allegations or transactions at issue in the audits or investigations must have been publically disclosed to at least one member of the "public."  See Meyer, 565 F.3d at 1201 ("[E]ven when the government has the information, it is not publicly disclosed under the Act until it is actually disclosed to the public."); Seal 1, 255 F.3d at 1161 ("Disclosure of information to one member of the public, when that person seeks to take advantage of that information by filing an FCA action, is public disclosure."); see also United States ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 1519 (9th Cir. 1995) ("[I]n passing the 1986 amendments, Congress specifically sought to diminish the government's ability 'to sit on, and possibly suppress, allegations of fraud when inaction might seem to be in the interest of the government.'"), rev'd on other grounds, Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939 (1997); accord Haight, 445 F.3d at 1153 n.2.

It does not appear that any of the allegations underlying DHW's audit and Relator's qui tam action were

11

disclosed to the general public.  In his affidavit, Johnson
states that, to the best of his knowledge, "no reports, audits,
or other information about DHW's investigation was placed on
DHW's website." (Johnson Aff. ¶ 3.)  Lori Stiles, a member of
the Surveillance and Utilization Review Unit of DHW who has and
continues to participate in the DHW audit, states that she does
"not know of any reports, audits or other information nor did
[she] author any such report or audit about DHW's investigation
that was placed on DHW's website before the complaint in this
action was filed on April 25, 2007." (Id. Ex. C (Stiles Aff.) ¶¶
1-3.)

        Defendants neither dispute Johnson's and Stile's
representations nor suggest that any of the allegations of fraud
were released to the general public.  Instead, defendants contend
that the allegations underlying the DHW audit and Relator's qui
tam action were disclosed to the public when Johnson discussed
the audit with Relator and defendants' and IFRC's employees and
independent contractors.

        1.   DHW's Discussions with Relator

        In Seal 1, a relator filed a qui tam action against his
former employer, Packard-Bell NEC, Inc. ("PBNEC"), in April 1995.
255 F.3d 1157.  In September 1995, conversations with individuals
other than the relator prompted the United States Attorney's
Office ("USAO") to investigate Zenith, a company that had an
"'alliance agreement'" with PBNEC and subsequently became a
wholly-owned subsidiary and then a division of PBNEC.  Id.
Approximately nine months after the relator initiated his qui tam
action against PBNEC, the USAO allowed him to review PBNEC

12

documents it had obtained during its investigation of Zenith, and some of those documents "contained information raising the possibility that Zenith had committed fraud on the government similar to that committed by PBNEC." Id. Based on those documents, relator initiated a second qui tam action against Zenith.

In his qui tam action against PBNEC, the district court held that it had jurisdiction, and the relator ultimately received a share in the government's settlement with PBNEC. Id. at 1157-58. As to his qui tam action against Zenith, however, the district court held and the Ninth Circuit agreed that the government publicly disclosed Zenith's alleged fraud when it shared its investigation documents with the relator. Id. at 1157, 1162. The Ninth Circuit explained that the relator was a member of the public for purposes of the Zenith investigation because he was an "outsider" to that investigation. Id. at 1161. The court clarified, however, that a public disclosure may not have occurred if the government had disclosed the same information "to some other member of the public who [had] independently come[] upon information already possessed by the government . . . and who then file[d] an FCA action based on the information independently obtained." Id. at 1162.

In her 2005 Letter, which initiated DHW's audit (Johnson Dep. 16:19-17:21), Relator reported in detail about defendants' alleged fraud:

> Michelle then contacted Matt Stevens and started billing through Idaho Falls Recovery Center. . . . This leads me to the ongoing, current use of assistants/aides by Matt Stevens and Michelle Dahlberg. I have personally been contacted by a family who[se] son was to be seen by

13

Michelle Dahlberg who her assistant was going to see. . . . Recently the Speech and Language Clinic has started seeing children in groups, which is not a billable option through [a] medical facility with Medicaid. Michelle Dahlberg will see one child and the assistant will see another, but Michelle signs all the notes. You will only be able to determine if this has happened by looking for duplicate times on more than one patient's daily documentation records, where it would appear that Michelle somehow saw two people at the same time on the same day. You may [] only be able to tell by an interview with parents, transportation, or client if they are cognoscente enough to be reliable.

(Wayment Aff. Ex. 12 to Ex. A.)  When describing his telephone conversations with Relator, Johnson also explained that she "basically was reporting as to how aides were being used and how she felt that was inappropriate." (Johnson Dep. 74:12-24.)

This evidence establishes, by a preponderance of the evidence, that Relator had independent knowledge about defendants' alleged fraud before DHW began its audit and was thus not an "outsider" to DHW's audit. Accordingly, Relator did not learn about the alleged fraud from DHW, and DHW's communications with Relator could not have resulted in a public disclosure of Relator's qui tam allegations.

2.   DHW's and IFRC's Discussions with Defendants' and IFRC's Employees and Independent Contractors

In addition to Relator, DHW and IFRC also disclosed information about the audit to defendants' and IFRC's employees and independent contractors.[5]  The specific disclosures at issue

---

[5]   It is unclear from the record whether most of the SLPs and aides were employees or independent contractors of Dahlberg, SALC, IFRC, or another SLP. As Dahlberg was an independent contractor for IFRC and the qui tam action against defendants is based on conduct occurring at IFRC, the precise relationship of the SLPs and aides with defendants, IFRC, or another SLP does not affect the court's analysis.

14

are: 1) Johnson's March 24, 2006 audit letter to IFRC; 2) IFRC's March 30, 2006 change of policies letters; and 3) the April 18, 2006 meetings between Johnson and defendants' and IFRC's employees and independent contractors.

On approximately March 24, 2006, Johnson sent IFRC a letter informing it that DHW had initiated an investigation into its facility on November 7, 2005, and that, "[d]uring the course of the audit, it ha[d] been discovered and documented that on numerous occasions unqualified/unlicensed staff ha[d] been performing speech and language therapy, and [IFRC] ha[d] billed Idaho Medicaid for those services, in violation of Idaho Statute 56-388 A." (Duke Aff. Ex. A.)  In response, IFRC's Administrator, Lin Dee Hokanson, sent an identical change in policies letter to eleven therapists at IFRC.[6]  The letters informed the therapists that the IFRC Board had "approved and adopted the [] policies" of discontinuing the use of aides and "tag theme therapy" and instructed the therapists to immediately

---

[6]     The individuals who received a change in policies letter included Dahlberg, Alice Balcena, Laura Dolezal, Gunnell, Laura Tavenner, Keri James, Alyson Elsethagan, Brooke Belnap, Kay Williams, Davie Allen, and Jenny Johnson.  (Id. Ex. B.) Relator's January 2007 letter to Emfield indicates that Balcena, Dolezal, Elsethagan, Gunnell, and Tavenner are SLPs who worked for Dahlberg.  (Wayment Aff. Ex. 2 to Ex. A; Gunnell Dep. at 209:6-8.)  Belnap was either an SLP or aide working at IFRC. (Compare Duke Aff. Ex. C at 2 (identifying "Brooke" as an SLP at IFRC), with Johnson Dep. 108:9-25 (indicating that Belnap saw children by herself, but was still working to getting her SLP license and was supposed to be supervised by an SLP).)  Although the record does not appear to identify James, Williams, Allen, or Johnson, defendants do not suggest that these individuals were not SLPs, employees, or aides working at IFRC.  Similarly, defendants do not contend that the unidentified individuals who received courtesy copies of each letter--Reed Larsen, Daryl Shurtliff, and Dr. Steve Klippert--were not IFRC employees.

comply with these new policies.[7]  (Id. Ex. B.)

In a three-page letter to Johnson dated April 12, 2006, Dahlberg also responded to "concerns" about her billing practices, including her use of externs, aides, and group theory. (2d Guillon Aff. Ex. L.)  On April 18, 2006, Johnson and Lynette Porter also "met with the individual therapists at [IFRC]." (Duke Aff. Ex. A.)  During those meetings, Johnson indicated that DHW would likely require IFRC to repay the "billings generated by the 'group sessions'" and that Dahlberg was a "target" if DHW revoked licenses for any of the SLPs.  (Id. Ex. C.)

When confronted with similar disclosures, the Ninth Circuit has held that "employees of a corporation later sued under the FCA" are not "members of the public for purposes of that suit." Seal 1, 255 F.3d at 1161 (citing Schumer, 63 F.3d at 1519).  According to the Ninth Circuit, allowing disclosures to such employees to constitute a public disclosure would conflict with the FCA because the "strong economic incentive [an employee has] to protect the information from outsiders" could prevent "revelation of information to an employee [from] trigger[ing] the potential for corrective action presented by other forms of disclosure." Id.  The court further emphasized that holding otherwise "'would run contrary to [the] purpose [of the FCA], for it drastically curtails the ability of insiders to bring suit once the government becomes involved in the matter.'"  Id.

---

[7]  Although DHW's audit letter is dated March 24, 2006, the change in policies letters dated March 30, 2006 state that the IFRC Board adopted the new policies on March 22, 2006.  It therefore appears that the change in policies letters misstate the meeting date of the Board's action or that DHW discussed the audit with IFRC before sending the March 24, 2006 letter.

(alterations in original).  DHW's disclosures to defendants or their employees are therefore insufficient to constitute public disclosures.

Although some of the SLPs and aides were independent contractors, not employees, of defendants, IFRC, or other SLPs, the Ninth Circuit's rationale from Seal 1 still applies.  The primary allegations underlying DHW's audit were based on the independent contractors' use of aides or team therapy.  As this conduct potentially resulted in defendants' billing for services that Medicare and Medicaid did not cover, the independent contractors and aides had very real interests in keeping the information confidential to protect their professional reputations and licenses.  (See, e.g., Johnson Dep. 109:7-15 (explaining that Belnap was "very reluctant" to talk to him because she feared retaliation from Dahlberg and that Belnap asked Johnson "to meet her away from the facility because she felt uncomfortable because she was being managed to get her licensing from ASHA, and she was fearful that there would be retaliation, so she asked that [they] meet somewhere else and then she called and basically canceled on [Johnson]"); see also Duke Aff. Ex. C (memorializing that Johnson indicated that the revoking of SLP licenses was a possibility).)

Independent contractors providing therapy at IFRC also had substantial financial incentives to ensure a favorable resolution of the audit, which could be frustrated by public disclosure of the accusations.  For example, Dahlberg's contract with IFRC provided that she was required to reimburse IFRC for any partial reimbursements it received from a third-party payor,

17

1    and it allowed IFRC to immediately terminate the contract if IFRC

2    lost its certification as a Medicare provider.  (2d Guillon Aff.

3    Ex. G at Addendum 3; see id. ¶ 4.3 (reserving for IFRC and

4    Dahlberg "any common law right of indemnity and/or

5    contribution"); id. ¶¶ 1.2.3.1, 1.6, 1.12, 5.6 (suggesting that

6    Dahlberg would be in material breach of her contract with IFRC if

7    she violated Medicare or Medicaid regulations); Duke Aff. Ex. C

8    (indicating that Johnson informed IFRC that it might have to

9    repay DHW for claims that were not covered).)  Similar to

10   Dahlberg, the DHW audit more than likely presented a financial

11   risk to the SLPs and aides that worked for IFRC, Dahlberg, or

12   another SLP at IFRC.  The independent contractors providing

13   therapy at IFRC are thus indistinguishable from the employees in

14   Seal 1, and any disclosures DHW or IFRC made to them are

15   insufficient to result in a public disclosure under §

16   3730(e)(4)(A).

17            3.   Relator's Deposition Testimony in the Prior State

18                 Action

19            Finally, defendants contend that Relator publicly

20   disclosed the allegations giving rise to her qui tam action

21   through her deposition testimony in a prior Idaho state court

22   action, Peak Performance Therapy Services, P.C. v. Mountain View

23   Hospital, LLC, No. 06-4944.  In that case, Relator was deposed as

24   a non-party on March 28, 2007, based on her former employment

25   with the plaintiff.  (Duke Aff. Ex. E (Putnam Dep.) 8:15-9:4.)

26   During that deposition, Relator testified about defendants' use

27   of aides, the provision of services outside the 35-mile radius,

28   her reporting of the alleged fraud to DHW, and her subsequent

conversations with Johnson.  (2d Wayment Aff. Ex. B (Mar. 28, 2007 Putnam Dep.) at 41:23-42:10, 43:5-14, 44:8-12, 21-24, 57:7-13.)

"[I]nformation disclosed though civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing [for] the purposes of section 3730(e)(4)(a)."  <u>United States v. Northrop Corp.</u>, 59 F.3d 953, 966-67 (9th Cir. 1995) (internal quotation marks omitted).  "That documents filed with an agency or court during administrative proceedings or civil litigation are considered publicly disclosed is a firmly established principle."  <u>Hagood v. Sonoma County Water Agency</u>, 81 F.3d 1465, 1474 n.13 (9th Cir. 1996).  Circuit courts disagree, however, about whether a discovery document produced during a civil hearing but never filed with the clerk's office can also result in a public disclosure under § 3730(e)(4)(a).

In <u>Schumer</u>, the Ninth Circuit directly confronted the split of authority and, in dicta, rejected the Third Circuit's holding that "a discovery document turned over to another party to the litigation, but not actually filed with the court, should be deemed publicly disclosed."  63 F.3d at 1519-20.  In doing so, the court was persuaded by the District of Columbia Circuit's distinction between "actual" and "theoretical" availability of documents:

> [The District of Columbia Circuit] concluded that only discovery material "actually made public through filing" was disclosed.  It concluded that discovery material exchanged by parties but not filed with the court "is only <u>theoretically</u> available upon the public's request."  We conclude that the District of Columbia Circuit's distinction between actual and theoretical availability

is persuasive . . . .

Id. at 1520 (quoting United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 652 (D.C. Cir. 1994)).

Although Schumer may no longer be binding precedent,[8] the Ninth Circuit's clear rejection of finding a public disclosure based on discovery documents that are not publicly filed with the court is highly persuasive and appears to be consistent with a majority of the circuit courts that have addressed the issue.  See United States v. Bank of Farmington, 166 F.3d 853, 860 (7th Cir. 1999) ("[T]he language of the statute itself is 'public disclosure,' not 'potentially accessible to the public.'"), overruled on other grounds by Glaser v. Wound Care Consultants, Inc., --- F.3d ----, 2009 WL 1885500 (7th Cir. 2009); United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1519 (10th Cir. 1996) ("We agree with the District of Columbia and Ninth Circuits that 'public disclosure' signifies more than the mere theoretical or potential availability of information."); cf. Meyer, 565 F.3d at 1199 (indicating relators' concession that a public disclosure occurred when "very similar allegations" were disclosed in a complaint filed in a prior action).

Here, the transcript from Relator's March 28, 2007 deposition in the state action was not filed with the state

---

[8]   Compare Haight, 445 F.3d 1147, 1153 n.2 (9th Cir. 2006) (noting that, because Schumer was vacated by the Supreme Court on grounds unrelated to the public disclosure analysis, it is "only persuasive authority and is not binding precedent"), with Meyer, 565 F.3d at 1200, and Seal 1, 255 F.3d at 1161 (applying Schumer's public disclosure analysis as precedent).

court.   Any disclosures Relator made in that deposition were
therefore limited to the parties in the action and only
theoretically available to members of the public.   Cf. Seattle
Times Co. v. Rhinehart, 467 U.S. 20, 33 & 33 n.19 (1984)
("[P]retrial depositions and interrogatories are not public
components of a civil trial. . . . Jurisdictions that require
filing of discovery materials customarily provide that trial
courts may order that the materials not be filed or that they be
filed under seal. . . . Thus, to the extent that courthouse
records could serve as a source of public information, access to
that source customarily is subject to the control of the trial
court."); (Hirst Aff. Ex. 1 (Putnam Dep.) at 12:19-24 (indicating
that defendants' counsel obtained a copy of Relator's prior
deposition transcript only through discovery in this case).)
Therefore, the transcript from Relator's deposition testimony in
the prior state case did not result in a public disclosure under
§ 3730(e)(4)(A) because it was not filed with the state court and
thereby publically disclosed in the course of the civil hearing.[9]

---

[9]     In her March 27, 2008 deposition, Relator also
testified that a "team" of people put together a report
(presumably the 2005 Letter) for Medicaid about the alleged
fraud.   According to Relator's testimony, the team included
Lorraine Hart (a former Dahlberg aide), two Idaho State
University (ISU) graduate students who had done SLP internships
(Brenda Malepeai and Jen Taylor), Trent Gunnell (an SLP who
contracted with Dahlberg), and Jessica Hartson (a former aide to
two therapists who contracted with Dahlberg).   (Mar. 28, 2007
Putnam Dep. 44:21-47:4.)   In describing the "team," Relator
answered affirmatively when asked whether the two ISU students
"complained to the college." (Id. at 45:6-8.)   Defendants do
not, however, contend that the ISU students publicly disclosed
the relevant allegations to the college, and the record neither
confirms the existence nor reveals the content of those
complaints.

21

Accordingly, because Relator's <u>qui tam</u> allegations about defendants' alleged fraud were not publicly disclosed, the court need not determine whether Relator was an original source of those allegations and must deny defendants' motion to dismiss Relator's <u>qui tam</u> action based on that conduct.

IT IS THEREFORE ORDERED that (1) Dahlberg and SALC's motion to dismiss Relator's FAC be, and the same hereby is, DENIED; and (2) Dahlberg and SALC's motion to file a response to Relator's reply brief in opposition to IFRC's reply and Relator's motion to strike new evidence and arguments in IFRC's reply brief be, and the same hereby are, DENIED as moot.

DATED:   September 8, 2009

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

22