UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

----oo0oo----

UNITED STATES OF AMERICA,
ex rel. JENNIFER PUTNAM,

                    Plaintiff,

          v.

EASTERN IDAHO REGIONAL MEDICAL
CENTER; EASTERN IDAHO HEALTH
SERVICES, INC.; THE BOARD OF
TRUSTEES OF MADISON MEMORIAL
HOSPITAL, a/k/a, d/b/a MADISON
MEMORIAL HOSPITAL; IDAHO FALLS
RECOVERY CENTER; MATTHEW
STEVENS; MICHELLE DAHLBERG;
SPEECH AND LANGUAGE CLINIC,
INC.; PREMIER THERAPY
ASSOCIATES, INC., a/k/a THERAPY
SERVICES, INC., a/k/a TETON
SPEECH LANGUAGE PATHOLOGY, INC.;
HCA INC., a/k/a HCA - THE
HEALTHCARE COMPANY; HCA -
MANAGEMENT SERVICES, L.P., HTI
HOSPITAL HOLDINGS, INC.; HEALTH
TRUST, INC. - THE HOSPITAL
COMPANY and DOES 1 through 50,

                    Defendants.
_____/

NO. CIV. 4:07-192 WBS

MEMORANDUM AND ORDER RE:
MOTIONS FOR PARTIAL SUMMARY
JUDGMENT

----oo0oo----

1

This action under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), is based on several speech language pathologists' and Medicare and Medicaid providers' alleged practice of billing Medicare or Medicaid for speech language services performed by unlicensed aides or assistants. Now pending before the court are the United States' motion and defendants Matthew Stevens, Premier Therapy Associates, Inc., also known as Therapy Services, Inc. and Teton Speech Language Pathology, Inc., and Teton Services, Inc.'s ("defendants") cross-motion for partial summary judgment.

I. <u>Factual and Procedural Background</u>

Stevens is a certified speech language pathologist ("SLP") in Idaho and is the owner of Premier Therapy Associates, Inc., which was formerly known as Teton Services, Inc. (U.S.' Third Corrected Am. Compl. ¶ 14.) On January 14, 1997, defendants entered into a Speech Pathology Services Agreement ("SPS Agreement") with defendant Madison Memorial Hospital ("Madison").[1] (Howe Aff. Ex. A.) Pursuant to the SPS Agreement, defendants provided speech therapy for outpatients of Madison at two different facilities in Idaho. Many of defendants' patients qualified for Medicaid and, even though the existing regulations did not allow SLPs to become Medicaid providers, Madison was able to seek reimbursement from Medicaid for defendants' treatment of its outpatients. Idaho Admin. Code r. 16.03.09.738 (2007); (Howe Aff. Ex. B ("Kearl Dep.") at 28:24-29:1.)

---

[1]     The Board of Trustees of Madison Memorial Hospital, also known as and doing business as Madison Memorial Hospital, is a defendant in this action but is not a party to the pending motions for summary adjudication.

Pursuant to the SPS Agreement, defendants invoiced Madison $20.00 for each fifteen-minute unit "expended in speech pathology services." (Howe Aff. Ex. A § 4.C.) As discussed in more detail below, defendants often had unlicensed aides or assistants[2] meet alone with a patient for part of the patient's appointment and invoiced that time to Madison as time "expended in speech pathology services." For example, defendants would schedule two patients for the same hour and have an SLP meet with one patient for the first thirty minutes while the SLP's aide or assistant met with the other patient, and then the SLP and aide or assistant would swap patients for the remaining thirty minutes. When defendants utilized aides or assistants in this fashion, they invoiced Madison for two hours of "speech pathology services" and did not indicate that an aide or assistant performed one hour of the services.

To submit their invoices to Madison, defendants' employees entered the number of fifteen-minute units the SLPs indicated were spent with a patient into a program known as "AS400,"[3] which Madison provided. (Id. Ex. Aa ("Strayer Dep.")

---

[2]    Idaho law did not provide for the licensing of SLP aides or assistants until 2005. See Idaho Code Ann. § 54-2903(16)-(17). The parties agree that whether defendants' employees are considered aides or assistants or were licensed after 2005 is not material to the United States' FCA causes of action.

[3]    Defendants also used "REDOC" software to keep track of time spent with a patient. Although it appears the AS400 program, not the "REDOC" software, prepared the invoices submitted to Madison, it is not entirely clear from the witnesses' testimony which program actually created the invoices. (See, e.g., Howe Aff. Ex. F ("Christensen Dep.") at 96:8-98:5.) The precise program used is not material to the United States' FCA causes of action.

3

at 15:17-22.)  The invoiced units for each patient were then electronically transmitted to Madison at the end of each month so that Madison could pay defendants and determine the charges to bill Medicaid.  (See id. at 15:25-16:5; Christensen Dep. 98:2-3; Howe Aff. Ex. J ("Berrett Aff.") ¶ 4.)  In submitting their time, it is undisputed that defendants lumped time spent by aides or assistants with time spent by SLPs, thereby making it impossible for Madison, or even defendants' own employees, to differentiate between units attributable to SLPs and those attributable to aides or assistants.  (Kearl Dep. 49:12-14; Christensen Dep. 151:12-16, 159:18-160, 165:2-13.)  Based on defendants' invoices, Madison billed Medicaid for all of the services defendants provided to Medicaid patients, including the services that were not provided by an SLP.

Alleging that claims for services rendered by aides or assistants were not entitled to reimbursement under Medicaid and thus resulted in the submission of false claims to the government, Relator Jennifer Putnam initiated this qui tam action.  Pursuant to § 3730(b)(4) of the FCA, the United States intervened on June 19, 2007 and filed the operative Corrected Third Amended Complaint nine months later.  (Docket Nos. 111, 116.)

The United States now moves for summary adjudication on the issue of liability with respect to its § 3729(a)(1) and § 3729(a)(2) FCA causes of action for the fiscal years 2003 to 2007.  Defendants then filed a cross-motion for partial summary judgment, requesting the court to find, as a matter of law, that Medicaid provides for billing of speech therapy services on a per

4

session basis and that defendants are not responsible for the
bills Madison submitted to Medicaid because defendants are not
Medicaid providers.[4]

II.  Discussion

Summary adjudication is proper "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c); see also id. R. 56(a) ("A party claiming
relief may move, with or without supporting affidavits, for
summary judgment on all or part of the claim.").  A material fact
is one that could affect the outcome of the suit, and a genuine
issue is one that could permit a reasonable jury to enter a
verdict in the non-moving party's favor.  Scott v. Harris, 550
U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248 (1986).  The party moving for summary adjudication bears
the initial burden of establishing the absence of a genuine issue
of material fact and can satisfy this burden by presenting
evidence that negates an essential element of the non-moving

[4]    For the first time at oral argument, defendants
indicated that they also requested summary adjudication with
respect to the inapplicability of the Fraud Enforcement Recovery
Act of 2009 to this case.  Although the court must address
whether that Act governs this case, defendants did not dispute
the applicability of the Act in their memoranda in opposition to
the United States' motion or in support of their own motion.
        Defendants also argued at oral argument that Count II
from the United States' Corrected Third Amended Complaint should
be dismissed because it alleges only that defendants "submitted,"
not "caused to be submitted," false claims.  Defendants' motion
and supporting memoranda are silent as to any such request and do
not attack the sufficiency of the allegations in the Corrected
Third Amended Complaint.  The court will therefore not address
whether the United States sufficiently plead Count II, which
alleges a claim under § 3729(a)(3).

party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the non-moving party "may not rely merely on allegations or denials in its own pleading," but must go beyond the pleadings and, "by affidavits or as otherwise provided in [Rule 56,] set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324; Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989). In its inquiry, the court must view any inferences drawn from the underlying facts in the light most favorable to the nonmoving party, but may not engage in credibility determinations or weigh the evidence. Anderson, 477 U.S. at 255; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When, as in this case, parties submit cross-motions for partial summary judgment, the court must "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092, 1097 (9th Cir. 2003), cert. denied, 540 U.S. 1110 (2004); accord Fair Hous. Council v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).

A.   Fraud Enforcement Recovery Act of 2009

Before assessing whether the United States is entitled to summary adjudication on its causes of action under § 3729, the court must determine which version of § 3729 controls.

6

In 2009, Congress passed the Fraud Enforcement Recovery Act of 2009 ("FERA") and amended both of the subsections of § 3729 that are at issue in the pending motions.  In addition to the substantive changes discussed below, FERA also altered the subdivision of the statute, making what was § 3729(a)(1) become § 3729(a)(1)(A) and what was § 3729(a)(2) become § 3729(a)(1)(B).  Because the court ultimately concludes that FERA's amendments do not govern the United States' FCA causes of actions, the court will refer and cite to the pre-FERA subsections in this Order.

With respect to § 3729(a)(1), FERA deleted the following underscored language: "Any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval . . . ."  Pub. L. No. 111-21, § 4(a), 123 Stat. 1617 (2009).  The amendments to § 3729(a)(1) apply only to conduct that occurred after FERA was enacted on May 20, 2009, id. § 4(f), and thus the pre-FERA version of § 3729(a)(1) governs the United States' cause of action under that subsection.

With respect to § 3729(a)(2), FERA amended the underscored provisions for liability from any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government" to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Id. § 4(a).  When enacting FERA, Congress provided that the amendments to § 3729(a)(2) "shall take effect as if enacted on June 7, 2008, and

7

apply to all <u>claims</u> under the [FCA] . . . that are pending on or after that date." <u>Id.</u> § 4(f)(1) (emphasis added). In a cursory footnote, the United States contends that the post-FERA version of § 3729(a)(2) controls in this case because its FCA causes of actions (i.e., "claims") were pending on June 7, 2008. The court must therefore determine whether Congress intended "claims" to refer to claims made to the government and governed by the FCA or claims alleged by the government in an FCA lawsuit.

In relevant part, § 3729(b)(2) currently defines "claim" as "any request or demand, whether under a contract or otherwise, for money or property . . . [that] is presented to an officer, employee, or agent of the United States . . . ." Before FERA, § 3729(c) similarly defined "claim" as

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, guarantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

The pre- and post-FERA definitions of "claim" in § 3729 unequivocally encompass claims made to the government, not FCA claims or causes of action alleged by the government in an FCA action. The titles of § 3729 ("False <u>Claims</u>") and the Act to which it belongs ("False <u>Claims</u> Act") further underscore that "claims" is a term of art in FCA cases that refers to claims made to the government for money or property.

FERA and its legislative history also show that Congress used the term "claims" to refer to requests for money or property made to the government and "cases" to refer to civil FCA

8

actions.  For example, immediately following Congress's provision for retroactive application of the amendments to § 3729(a)(2) to claims pending on or after June 7, 2008, it provided for immediate application of a different FERA amendment to "cases pending."  See Pub. L. No. 111-21, § f(2) ("[S]ection 3731(b) of title 31, as amended by subsection (b); section 3733, of title 31, as amended by subsection (c); and section 3732 of title 31, as amended by subsection (e); shall apply to cases pending on the date of enactment.") (emphasis added); see also, e.g., S. Rep. No. 111-10 (2009), reprinted in 2009 U.S.C.C.A.N. 430, 438 ("Following the decision in [United States ex. rel. Totten v. Bombardier Corp., 380 F.3d 488 (D.C. Cir. 2004)] a number of courts have held that the FCA does not reach false claims that are (1) presented to Government grantees and contractors, and (2) paid with Government grant or contract funds.  These cases are representative of the types of frauds the FCA was intended to reach when it was amended in 1986.").  Congress's use of the words "claims" and "cases" when amending the FCA and providing for retroactive application of certain subsections therefore illustrates that it intended claims to encompass claims for money or property that are governed by the FCA, not cases brought to enforce it.

The only two other district courts that have addressed this issue have also rejected the United States' position that the amendments to § 3729(a)(2) apply to FCA cases pending on or after June 7, 2008.  See United States ex rel. Sanders v. Allison Engine Co., Inc., --- F. Supp. 2d ----, 2009 WL 3626773, at *4 (S.D. Ohio Oct. 27, 2009); United States v. Science Applications

9

Intern. Corp., 653 F. Supp. 2d 87, 107 (D.D.C. Sept. 14, 2009).
As the Sanders court discussed at length, application of FERA's
amendments to claims for money or property that were submitted to
and paid by the government before the effective date of the
amendments also raises serious ex post facto concerns. See
Sanders, 2009 WL 3626773, at *5-*10 (concluding that "retroactive
application of the new FCA language to [claims submitted and paid
before June 7, 2008] violates the Ex Post Facto Clause.").

Accordingly, because the claims for Medicaid
reimbursement at issue in this case were neither pending on nor
filed after June 7, 2008, the pre-FERA version of § 3729(a)(2)
governs the United States' cause of action under that subsection.

B.   Subsection 3729(a)(1)

Subsection 3729(a)(1) provides for FCA liability if a
person "knowingly presents, or causes to be presented, to an
officer or employee of the United States Government or a member
of the Armed Forces of the United States a false or fraudulent
claim for payment or approval."  To establish a cause of action
under § 3729(a)(1), "the government must prove three elements:
(1) a 'false or fraudulent' claim; (2) which was presented, or
caused to be presented, by the defendant to the United States for
payment or approval; (3) with knowledge that the claim was
false."  United States v. Mackby, 261 F.3d 821, 826 (9th Cir.
2001).  Although § 3729 did not expressly contain a materiality
requirement before FERA added one in 2009, the Ninth Circuit and
at least five other circuit courts previously held that the
government must also prove that the false statement was material.
United States v. Bourseau, 531 F.3d 1159, 1170-71 (9th Cir.

10

2008).

1. <u>False or Fraudulent Claim</u>

"The FCA does not define false. Rather, courts decide whether a claim is false or fraudulent by determining whether a defendant's representations are accurate in light of applicable law." <u>Id.</u> at 1164-65. For example, a claim may be false "even if the services billed were actually provided, if the purported provider did not actually render or supervise the service." <u>Mackby</u>, 261 F.3d at 826. Courts have also "interpreted the FCA to cover claims for . . . Medicare cost reports containing nonallowed or inflated costs." <u>Bourseau</u>, 531 F.3d at 1164-65 (citing <u>United States v. Halper</u>, 490 U.S. 435, 437 (1989), <u>overruled on other grounds by</u> Hudson v. United States, 522 U.S. 93 (1997); <u>United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.</u>, 400 F.3d 428, 451 (6th Cir. 2005); <u>Shaw v. AAA Eng'g & Drafting, Inc.</u>, 213 F.3d 519, 530 (10th Cir. 2000)).

The Idaho Administrative Code ("IDAPA") governs reimbursement for services provided to Medicaid patients. Beginning on July 1, 1999 and continuing until July 1, 2006, the IDAPA defined "Speech/Language Pathology And Audiology Services" as "[d]iagnostic, screening, preventative, or corrective services <u>provided by a speech pathologist</u> or audiologist, for which a patient is referred by a physician or other practitioner of the healing arts within the scope of his or her practice under state law." Idaho Admin. Code r. 16.03.09.003.73 (July 1, 1999) (emphasis added). From July 1, 2006 to April 2, 2008, the definition remained substantially the same but added a licensing requirement for speech pathologists based on new state statutory

11

requirements for licensing enacted in 2005.  <u>Id.</u> r.

16.03.09.012.23, 16.03.10.013.34 (July 1, 2006); Idaho Code Ann.

§ 54-2903(15).[5]  The Idaho Department of Health and Welfare's

Rules and Minimum Standards for Hospitals in Idaho treat speech

pathology as a "rehabilitation service" and provide that

rehabilitation services "shall be provided in accordance with

orders of practitioners who are authorized by the medical staff

to order the services and <u>shall be given by qualified</u>

<u>therapists</u>."  Idaho Admin. Code r. 16.03.04.440.01 (emphasis

added).

Defendants do not dispute that, at all times relevant

to the pending motions, time spent by SLP aides or assistants was

not covered by or entitled to reimbursement from Medicaid.  In

fact, defendants' expert witness, Health Care Compliance Officer

Ned Hillyard, explained, "The Regulations . . . require that

speech language evaluations and speech language treatment

sessions be provided by a qualified and state licensed [SLP] in

order for the Provider to be reimbursed for such services."

(Howe Aff. Ex. N at Ex. A.)  Accordingly, because Medicaid did

not cover speech therapy provided by aides or assistants, a claim

for reimbursement for such services would constitute a false or

fraudulent claim under the FCA.

The undisputed evidence before the court establishes

that defendants had aides or assistants meet with patients

---

[5]     The IDAPA was further amended on April 2, 2008 to
provide that "[s]ervices provided by speech-language pathology
assistants are considered unskilled services, and will be denied
as not medically necessary if they are billed as speech-language
pathology services."  Idaho Admin. Code r. 16.03.09.732.02.

12

without an SLP and invoiced Madison for those units without distinguishing them from units of therapy administered by SLPs. (See, e.g., Kearl Dep. 26:7-13, 29:13-20, 42:4-44:19, 56:6-14, 74:13-18, 143:11-18; Christensen Dep. 88, 150:20-23, 152:3-22, 154; Howe Aff. Ex. G at 6; Howe Aff. Ex. I (Stiles Aff.) ¶¶ 5-7; see also Christensen Dep. 88:11-89:5 (testifying that, as Stevens's aide, she treated patients from 2002 until sometime in 2004 when Stevens was out of town and the units were invoiced to Madison).)[6] While it is therefore undisputed that defendants invoiced Madison for services rendered by aides or assistants, the parties dispute whether Madison billed Medicaid--and thereby made false claims to the government--for those services.

Defendants claim that any non-SLP units were not billed to Medicaid because the duration of a speech therapy appointment--and thus the amount of time the SLP spends with a patient--is irrelevant for purposes of Medicaid reimbursement. Assessing defendants' argument and determining whether Madison's bills to Medicaid included false claims for reimbursement of non-SLP time requires a basic understanding of the complicated Medicaid interim reimbursement and reconciliation processes.

Reimbursement for services rendered to Medicaid

---

[6] The parties dispute whether the SPS Agreement's provision for defendants to invoice Madison for "speech pathology services" encompassed services rendered by aides or assistants. (See Howe Ex. A §§ 2, 4.C (omitting a definition of "speech pathology services," but providing that uncapitalized terms "will have the ordinary meaning generally understood in the health care field").) Even if a genuine issue of fact about the interpretation of the SPS Agreement exists, the dispute is not material to defendants' potential liability under the FCA because the private agreement cannot alter the fact that Medicaid did not cover services rendered by aides or assistants.

patients begins with the interim reimbursement a provider receives after it bills Medicaid for a service. The interim reimbursement is a pre-determined percentage of the total amount charged for the service that is calculated based on the provider's cost-to-charge ratio (i.e., the costs the provider expended providing services compared to the charges it billed Medicaid for those services) from the prior fiscal year. (Carey Dep. at 43:18-44:11.) For example, if a provider billed Medicaid $200.00 for a service, it might have received only $160.00 as an interim reimbursement from Medicaid. (<u>Id.</u> at 20:13-18, 25:14-24.)

At the end of the fiscal year, Medicaid then conducted a reconciliation process to determine whether the interim payments the provider received during the year were sufficient or in excess of the provider's costs for the services it provided. (<u>Id.</u> at 107:21-108:25); <u>see generally</u> <u>Bourseau</u>, 531 F.3d at 1162 (discussing the Medicare reimbursement process). Similar to a tax return, the reconciliation process required Madison to submit a cost report to Medicare that included all of its costs for the services it provided. (Carey Dep. 45:4-21, 60:15-61:6.) Based on the Medicare cost report, Medicaid settled the total reimbursement for the fiscal year by giving a second reimbursement to the provider if its costs exceeded its interim reimbursements or requiring the provider to reimburse Medicaid if its costs were less than its interim reimbursements. (<u>Id.</u> at 45:4-21, 60:9-24.)

In preparing its billings to receive its interim reimbursements, Madison was required to identify the services it

14

provided according to the American Medical Association's Current Procedural Terminology ("CPT") Codes. Some CPT Codes provide a suggested duration of time for a service or require the provider to identify the duration of the service. However, the CPT Codes used for billing speech language therapy provide for billing on a per session basis without requiring the provider to meet a minimum amount or identify the duration of time for the appointment. (Covert Aff. Exs. A-F.)[7] Unlike the SPS Agreement's provision for invoicing based on fifteen-minute <u>units</u>, Medicaid provides for billing one speech therapy <u>session</u> regardless of whether the appointment lasted five minutes, forty-five minutes, or one hour. (<u>Id.</u>; Carey Dep. 35:15-19, 36:10-17.) Based on this per session billing system, defendants argue that Madison did not submit false claims to Medicaid because Medicaid entitled Madison to reimbursement for one session of speech therapy regardless of the amount of time an SLP spent with a patient.

While the CPT Codes may have allowed Madison to bill one session of therapy regardless of the duration of time the SLP spent with the patient, neither the CPT Codes nor Medicaid regulations established a flat rate for a speech therapy session. To the contrary, the amount of money Madison received during the interim reimbursement and reconciliation processes was directly affected by the amount of time the SLP spent with the patient.

_____

[7] Defendants provided the current CPT Codes, not the codes that were in effect between 2003 and 2007. Nonetheless, the United States has not suggested that the CPT Codes in effect during the years relevant to its pending motion were materially different or did not provide for the billing of speech therapy on a per session basis.

First, when preparing its billings to receive its interim

reimbursements, Madison may have billed for one session of

therapy regardless of duration, but the amount it billed for each

session varied depending on the du ration of the session.  (Carey

Dep. 49:8-11, 87:22-88:19; Howe Aff. Ex. J ("Berrett Aff.") ¶ 4.)

Therefore, when defendants' invoice for an appointment included

time for non-SLP services, Madison used that time to determine

the amount it billed Medicaid for the session and thus received

greater interim reimbursements than it would have if it did not

include non-SLP time in calculating its charge for the session.

Second, and more importantly, Madison included all of

the units defendants invoiced, including fees for services

performed only by aides or assistants, on its annual cost reports

during the reconciliation process.  (Id. at 45:22-46:18, 59:2-

60:8, 60:9-18, 65:15-66:4, 84:12-85:14, 106:3-7, 109:1-13; see

Howe Aff. Ex. P ("Hexem Aff.") ¶ 5 (indicating that all of the

payments Madison made to defendants between 2004 and 2007 "were

included by Madison as reimbursable in the cost reports submitted

to Medicare").)  Madison's inclusion of payments made to

defendants for services rendered by aides or assistants thus

resulted in Madison receiving reimbursement for services that

were not covered by Medicaid.

Consequently, the fact that Medicaid provided for

billing on a per session basis did not prevent Madison from

billing Medicaid for the services rendered by aides or assistants

because the number of units defendants invoiced directly affected

the interim reimbursements Madison sought and received and the

costs it was reimbursed for during the reconciliation process.

16

Accordingly, Madison's billings and cost reports included false

claims because they sought reimbursement for speech therapy

services that were rendered by aides or assistants.

2.   <u>Presentment</u>

Under the second element, which addresses causation, §

3729(a)(1) requires that a person "presents, or causes to be

presented" the false claim "to an officer or employee of the

United States Government or a member of the Armed Forces of the

United States."  31 U.S.C. § 3729(a)(1); <u>Mackby</u>, 261 F.3d at 827.

Although the statute refers specifically to presentment of a

claim to "an officer or employee of the United States

Government," defendants do not dispute and district courts have

almost unanimously held that presentment to the state agency

responsible for administering the state's Medicaid program is

sufficient because the funds used to pay the claims are

predominantly federal.  See <u>United States ex rel. Ven-A-Care v.</u>

<u>Actavis Mid Atl. LLC</u>, 659 F. Supp. 2d 262, 269 (D. Mass. 2009)

(citing five other district court cases that have "found that

Medicaid claims are presented to the federal government" and

recognizing a Northern District of Alabama case as the only case

reaching the opposite conclusion, which the same judge later

rejected); <u>see also</u> 31 U.S.C. § 3729(c) (defining "claim" to

include "any request or demand . . . for money or property . . .

if the United States Government provides any portion of the money

or property which is requested or demanded . . . ."); Federal

Medical Assistance Percentages or Federal Financial Participation

in State Assistance Expenditures (FMAP), <u>available at</u>

http://aspe.hhs.gov/health/fmap.htm (indicating that, during the

17

fiscal years at issue in the pending motions, the federal
government provided between 69.91 and 73.97 percent of the
Idaho's Medicaid funds).  The legislative history of § 3729(a)(1)
also confirms that Congress intended the FCA to extend to
fraudulent Medicaid claims.  See, e.g., S. Rep. No. 99-345
(1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5274 ("A false claim
for reimbursement under the Medicare, Medicaid or similar program
is actionable under the [FCA] . . . .").

Not only can presentment of a false claim to the state
agency responsible for administering Medicaid satisfy the
presentment requirement, a defendant "need not be the one who
actually submitted the claim forms in order to be liable."
Mackby, 261 F.3d at 827.  So long as the defendant caused the
false claim to be presented to the government, the defendant
cannot escape liability merely because the defendant did not
submit the claim or have "'direct contractual relations with the
government.'"  Id. (quoting United States ex rel. Marcus v. Hess,
317 U.S. 537, 544-45 (1943)).

Here, defendants' invoices to Madison clearly caused
Madison to present false claims to Medicaid.  The SPS Agreement
between defendants and Madison provided for defendants to submit
invoices to Madison and for Madison to obtain reimbursement from
Medicaid based on those invoices.  With respect to "Billing," the
SPS Agreement provides:

> The Hospital shall provide the services of the business
> office including filing, billing, collecting and carrying
> accounts receivable.  Contractor shall file with the
> business office of the Hospital daily charge sheets or
> records, setting forth the services performed and the
> fees determined pursuant to Section 4(A) of this
> Agreement.  The Hospital will bill the patient and/or his

> insurance or other responsible party directly <u>for the cost of the services performed</u>.  In billing for charges, the Hospital <u>shall include one charge to the patient for speech pathology services rendered to the patient and shall not distinguish between the Hospital and the Contractor's fee</u>.

(Howe Aff. Ex. A § 4.B (emphasis added).)  The SPS Agreement further provides that defendants' "records must be sufficient to enable the Hospital to obtain payment for its services and facilities . . . . [and that t]he Contractor will assist the Hospital to comply with any and all governmental record-keeping and reporting requirements." (<u>Id.</u> § 3.G.)  With respect to Medicaid, the SPS Agreement specifically states,

> The Contractor will comply with those provisions of the law which affect reimbursement to the Hospital and will cooperate fully with the Hospital in Medicare and Medicaid audits and other reimbursement matters.  The Contractor will not knowingly and intentionally do anything which will affect adversely such reimbursement or the Medicare/Medicaid provider status of the Hospital.

(<u>Id.</u> § 4.E.)

Consistent with the provisions of the SPS Agreement, Calvin Carey, Madison's Chief Financial Officer from January 1998 to October 2007, testified at his deposition that Madison "relied" on defendants to invoice the number of units of speech pathology services it provided to patients and that Madison "passed" the allowable costs to Medicaid.  (Carey Dep. 14:15-18, 25:6-13, 26:17-18, 84:12-85:14.)  Carey further explained that the charges Madison billed Medicaid and itemized on its cost reports were based on the number of units defendants identified in their invoices.  (<u>Id.</u> at 49:8-11, 60:9-18.)  Madison's current Chief Financial Officer, Gregory Hexem, also indicated that all of the payments Madison made to defendants for speech therapy

services between 2004 and 2007 (totaling $4,428,423.00) "were included by Madison as reimbursable in the cost reports submitted to Medicare." (Hexem Aff. ¶ 5.)

Accordingly, because defendants' invoices to Madison were intended to be used and were in fact used by Madison to determine the reimbursements it requested and received from Medicaid, defendants caused false claims to be presented to the government.

### 3. <u>Knowledge of Falsity</u>

As defined by § 3729, "knowingly" means that "a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)-(3).[8] Under this requirement, "no proof of specific intent to defraud is required." <u>Id.</u> § 3729(b).

The "knowingly" element of an FCA claim provides the requisite degree of scienter and carries forth Congress's intent that the FCA does not punish "'honest mistakes or incorrect claims submitted through mere negligence.'" <u>United States ex rel. Hochman v. Nackman</u>, 145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S. Rep. No. 99-345, at 7 (1986), <u>reprinted in</u> 1986 U.S.C.C.A.N. 5266, 5272). A defendant can avoid liability under § 3729(a)(1) if the defendant acted in reliance on "a good faith interpretation of a regulation . . . because the good faith

_____

[8] Although FERA renumbered the entirety of § 3729, including its definition of "knowingly" that is now in § 3729(b)(1)(A), it did not alter the definition.

nature of his or her action forecloses the possibility that the scienter requirement is met." United States ex rel. Oliver v. Parsons Co., 195 F.3d 457, 460 (9th Cir. 1999); accord United States ex rel. Lockyer v. Haw. Pac. Health Group Plan for Employees of Haw. Pac., 343 Fed. App'x 279, 281 (9th Cir. 2009).

At the same time, however, the definition of "knowingly" reaches "'what has become known as the "ostrich" type situation where an individual has "buried his head in the sand" and failed to make simple inquiries which would alert him that false claims are being submitted.'" Bourseau, 531 F.3d at 1168 (quoting S. Rep. No. 99-345, at 21 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5286). With § 3729, Congress thus "adopted 'the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.'" Id. "While the Committee intends that at least some inquiry be made, the inquiry need only be 'reasonable and prudent under the circumstances.'" Id.; see also Heckler v. Cmty. Health Servs. of Crawford County, Inc., 467 U.S. 51, 63-64 (1984) ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law . . . . As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement."); accord Bourseau, 531 F.3d at 1168; Mackby, 261 F.3d at 828.

In his brief affidavits, Stevens does not assert that he believed services rendered by aides or assistants were

entitled to reimbursement from Medicaid between 2003 to 2007.[9]
Defendants contend, however, that they believed the Medicaid
regulations and billing codes provided for Madison to bill
Medicaid for one session of therapy even if the SLP did not meet
with the patient for the entire appointment.  Based on this
understanding, defendants claim that their inclusion of any time
spent by aides or assistants in their invoices to Madison did not
"knowingly" result in Madison's false claims to Medicaid because
defendants believed Madison simply billed Medicaid for one
session of therapy regardless of the amount of time the SLP did
or did not spend with a patient.  Although defendants'
interpretation ultimately fails for the reasons discussed above,

---

[9]     Defendants have represented that, "At the time of
entering into [the SPS Agreement] in 1997, time expended by
assistants was billable to Medicaid pursuant to the guidelines."
The excerpt from a prior version of the IDAPA that defendants
provided to support this assertion references 1999 amendments,
thus appears to have been in effect sometime after 1997.  (See
Defendants' Supplement (Docket No. 241).)  In response to
defendants' filing, the United States also filed a Motion for
Leave to File Complete Legislative History to Supplement
Defendants' Post-Hearing Filing, which the court will grant.  In
its motion, the United States represents that the version
defendants filed is from 1999.
        The excerpt defendants filed states, "Medicaid will
only reimburse for services provided by qualified staff. . . .
Speech/Audiological therapy evaluation and treatment[:] Must be
provided by or under the direction of a speech pathologist or
audiologist who possesses a certificate of clinical competence
from the American Speech and Hearing Association; . . . ."  (Id.
at Idaho Admin. Code r. 16.03.09.05.1.)  It also states that
"[p]araprofessionals, such as aides or therapy technicians, may
be used by the school to provide . . . speech therapy if they are
under the supervision of the appropriate professional."  (Id. at
r. 16.03.09.06 (emphasis added).)
        Even assuming defendants' representation about the
content of the 1997 regulations is accurate, it is not relevant
with respect to defendants' knowledge during the years relevant
to the United States' pending motion because defendants do not
assert that they continued to believe that time spent by aides or
assistants was covered by Medicaid between 2003 and 2007.

defendants can withstand summary judgment on the knowledge element of § 3729(a)(1) if a disputed issue of fact remains with respect to whether defendants had knowledge of, were deliberately ignorant to, or recklessly disregarded the fact that Madison was billing and receiving reimbursement from Medicaid for services rendered by defendants' aides or assistants.

The United States has submitted evidence that suggests defendants did not hold their mistaken beliefs in good faith because they were, at the very least, reckless with respect to their invoices to Madison. First, the United States submitted a hand-written note by Stevens that memorialized a conversation he had with Steve Brown, a "Program Manager for Medicaid," on July 12, 2007. Stevens's note states:

> Asked for clarification on use of aides and/or assistants. Explained that we use assistants, <u>but that we don't bill for their time</u>. (We are contract agency and MMH bills for our time) I am present for a portion of all the therapy services . . . etc. Steve said we are using aids/assistants appropriately.

(Howe Aff. Ex. Q (emphasis added).) According to the United States, this note shows Stevens knew that services rendered by aides or assistants were not reimbursable under Medicaid, thus prompting him to intentionally misrepresent defendants' invoicing practices during the phone conversation. However, when all inferences are taken in favor of defendants, it would also be reasonable to infer from the note that Stevens's representation that defendants did not bill for time spent by aides or assistants was based on his belief that Madison was billing on a per session basis for services at a flat rate regardless of the duration of the appointment the SLP spent with the patient.

The United States also submitted "demand bills," which were patient-specific documents generated by the AS400 program on a monthly basis that identified all of the charges Madison had billed for a patient. (Carey Dep. 80:7-18, 103:9-104:17.) The discovery defendants produced in this case, (Howe Aff. ¶¶ 3-7), which included documents pertaining to patients Stevens treated, included copies of at least seventy-six monthly demand bills for services rendered between 2003 to 2007. (Howe Aff. Ex. D at 233287-233307 (patient file of Amy Campbell); <u>id.</u> Ex. E at 208309-208071, 208094-208113 (patient file of Andrew Rushton); <u>id.</u> Ex. H at 00305 (patient Hyrum Whittaker), 00159 (patient Mikel Townsley); <u>see</u> Christensen Dep. 170, 173 (indicating that Whittaker and Townsley were Stevens's patients).)

The demand bills defendants produced list the duration of time billed for each visit; some of the demand bills indicate the duration of a visit by listing the quantity of fifteen-minute units and others list the total duration of each visit. For each appointment, the demand bills charge a price that corresponds with the duration of the visit. For example, a thirty-minute session was billed at $79.00, a forty-five-minute session was billed at $120.00, a sixty-minute session was billed at $160.00, and a session of six fifteen-minute units (one-and-a-half hours) was billed at $240.00. (Howe Aff. Ex. E at 208052-208054.) Significantly, the amount charged for each session has a direct correlation to the duration of the session, with Madison billing $39.50-$40.00 for every fifteen minutes in 2003, $40.00 for every fifteen minutes in 2004, and $40.00-$41.75 for every fifteen minutes in 2005. (<u>Id.</u> Ex. D at 233287-233307; <u>id.</u> Ex. E at

24

208309-208071, 208094-208113; <u>id.</u> Ex. H at 00305, 00159.)

The demand bills also indicate deductions to the balances that are credited to "Allowance Medicaid" and "PMT Medicaid EDS." (<u>Id.</u> Ex. D at 233275-233307; <u>id.</u> Ex. E at 208309-208113; <u>id.</u> Ex. H at 00305, 00159.) In all of the demand bills before the court, the deductions credited to "Allowance Medicaid" or "PMT Medicaid EDS" equal the exact amount of the charges on the particular demand bill, thus bringing the balance on each of the demand bills to zero based solely on allowances or payments attributed to Medicaid. (<u>Id.</u> Ex. D at 233287-233307; <u>id.</u> Ex. E at 208309-208071, 208094-208113; <u>id.</u> Ex. H at 00305, 00159.)

Despite defendants' access to these demand bills, Stevens states in his affidavit that "[a]t no[] time did [Madison] inform or involve me or anyone at Premier Therapy Associates, Inc., Teton Speech Language, Inc., or Teton Speech Language Pathology Services of the billing system between [Madison] and Medicaid and Medicare." (Stevens Aff. ¶ 19.) In light of defendants' professed lack of knowledge about Madison's billings to Medicaid, the United States has failed to show that defendants saw or, more importantly, that they understood the demand bills.

First, the date noted at the top of each demand bill is August 8, 2007, which corresponds to the production of discovery in this case and suggests that none of the demand bills were printed until discovery commenced in this case. While it is thus undisputed that defendants had access to the demand bills via their computers, a jury could reasonably infer that defendants neither accessed nor viewed the demand bills at the times

25

relevant to the dispute.  Based on defendants' purported lack of knowledge about Madison's billing to Medicaid and the knowledge required to understand the demand bills, a jury could also reasonably find that the demand bills were insufficient to put defendants on notice that Madison was billing for services rendered by aides or assistants.  Consequently, whether defendants viewed the demand bills and whether they acted knowingly, deliberately ignorant, or recklessly when they continued to invoice Madison for services rendered by aides or assistants despite the information in the demand bills raise disputed issues of fact that must be resolved at trial.

The United States also submitted Carey's deposition, in which he explained that, for at least a period of time, Madison sent Stevens daily emails that included a link to an attachment created by the AS400 program that showed the amount Madison billed Medicaid for each patient that day.  (Carey Dep. 54:9-15, 79:6-15, 102:12-23.)  Although Stevens had difficulty opening the link for a certain amount of time, Carey personally went to defendants' office and ensured that the link was working.  (Id. at 54:16-56:7, 69:20-70:17.)  It is unclear from Carey's testimony, however, whether those emails were sent at the times relevant to this dispute and whether the information was broken down by each visit like the demand bills.  Carey's testimony is thus insufficient to establish, as a matter of law, that defendants knew or acted in deliberate ignorance or with a reckless disregard to the fact that Madison was billing Medicaid for time expended by aides or assistants.

Lastly, there is no evidence before the court

suggesting that Stevens had knowledge about the complicated Medicaid reconciliation process or that Madison included the fees it paid to defendants for non-SLP services in its annual cost reports.   In fact, Stevens states in his affidavit, "During the time period at issue in this case, I had no knowledge of [Madison's] cost report procedure, guidelines, or percentages. No one from Madison [] ever discussed the cost report or explained what it was or its purpose to me or anyone with Premier Inc."  (Second Stevens Aff. ¶¶ 3-4.)

Accordingly, the United States has failed to establish the lack of a genuine issue of material fact with respect to whether defendants knew or acted in deliberate ignorance or with a reckless disregard to the fact that Madison was billing and receiving reimbursement from Medicaid for services rendered by defendants' aides or assistants.

### 4. Materiality

A false statement is material if "it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Bourseau, 531 F.3d at 1171 (internal quotation marks omitted) (alteration in original).  The natural tendency test "focuses on the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered."  Id.  Based on the court's prior discussion about how the number of units defendants invoiced directly affected the interim and final reimbursements Madison requested and received, defendants' invoices and the resulting billings to Medicaid clearly satisfy the FCA's materiality requirement.

27

C.  Subsection 3729(a)(2)

Subsection 3729(a)(2) of the FCA provides for liability for "[a]ny person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  The court's conclusions that Madison's requests for reimbursement for non-SLP services constituted "false or fraudulent" claims and that defendants' statements satisfy the materiality requirement apply equally to the United States' § 3729(a)(2) cause of action. Similarly, because the definition of "knowingly" for § 3729(a)(2) is the same as it is for § 3729(a)(1), the court's conclusion that a genuine issue of material fact remains on that element also applies to the United States' cause of action under § 3729(a)(2).  See Wang v. FMC Corp., 975 F.2d 1412, 1420 (9th Cir. 1992) ("The Act's scienter requirement is laid out in section 3729(b).").  Thus, the unique element of the United States' cause of action under § 3729(a)(2) is that the defendants must have caused a false record or statement to be made or used "to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2); see also Allison Engine Co., Inc. v. United States ex rel. Sanders, 128 S. Ct. 2123, 2130 n.2 (2008) (explaining that the intent deriving from 3729(a)(2)'s "to get" language is distinct from the statute's "knowing" element).

In a recent decision, the Supreme Court held that the "to get" language in § 3729(a)(2) requires an FCA plaintiff to prove that the defendant "intended that the false record or statement be material to the Government's decision to pay or approve the false claim," which requires that the defendant had

"the purpose of getting a false or fraudulent claim 'paid or approved <u>by the Government</u>.'" <u>Allison Engine Co., Inc.</u>, 128 S. Ct. at 2126, 2128 (emphasis added). The Court further explained that "getting a false or fraudulent claim 'paid . . . by the Government' is not the same as getting a false or fraudulent claim paid using 'government funds.' Under § 3729(a)(2), a defendant must intend that the Government itself pay the claim." <u>Id.</u> at 2128 (internal citation omitted).

Similar to the case at hand, <u>Allison Engine Co.</u> dealt with claims made by a subcontractor that were submitted to the prime contractor. The Court explained that a subcontractor's submission of a false statement to a private entity is insufficient unless the subcontractor intends for "the Government to rely on that false statement as a condition of payment." As an example, the Court suggested that the "to get" requirement could be satisfied if a subcontractor made a "a request or demand that was originally 'made to' a contractor, grantee, or other recipient of federal funds and then <u>forwarded to the Government</u>." <u>Id.</u> at 2129 n.1 (emphasis added). It would be insufficient, however, to show "merely that '[t]he false statement's use . . . result[ed] in obtaining or getting payment or approval of the claim.'" <u>Id.</u> at 2126 (alterations and omission in original).

Here, defendants neither submitted claims to Medicaid nor received payments from Medicaid. As discussed above, defendants' invoices--which indeed caused the submission of false claims to Medicaid--were submitted to and paid only by Madison. There is no evidence that the government ever received those invoices or was even aware they existed. Furthermore, the SPS

29

Agreement did not contemplate that defendants' receipt of payment
from Madison was dependent on Madison's receipt of reimbursement
from Medicaid, nor did it provide for Madison to receive a
reimbursement from defendants if Medicaid denied Madison's claims
based on the services defendants provided.  (Howe Aff. Ex. A ¶
4.C; see also Carey Dep. 78:7-10 (answering affirmatively when
asked, "So irrespective of what Medicaid finally compensated you,
you paid him pursuant to that contract?").)

          At most, it would be reasonable to infer that
defendants may have wanted Medicaid to reimburse Madison in an
amount equal to or exceeding the charges defendants invoiced
because Medicaid's reimbursement at a lesser amount may have
jeopardized defendants' continued relationship with Madison.
Even if defendants harbored such an intent, the "direct link"
between defendants' false statement and Medicaid's decision to
reimburse Madison is too "attenuated" to establish liability.
Allison Engine Co. Inc., 128 S. Ct. at 2130.  Therefore, while it
is clear that defendants intended Madison to rely on its false
statements in their invoices, there is no evidence that
defendants intended the government to receive, let alone rely on,
their statements.  See id. ("If a subcontractor or another
defendant makes a false statement to a private entity and does
not intend the Government to rely on that false statement as a
condition of payment, the statement is not made with the purpose
of inducing payment of a false claim 'by the Government.'")
(emphasis added).

          Accordingly, even though defendants' statements in
their invoices caused false claims to be submitted to the

government, the United States has failed to establish that defendants made the statements with the intent that the government rely on and pay their invoices.

III. <u>Conclusion</u>

On its § 3729(a)(1) cause of action for fiscal years 2003 through 2007, the United States has proven the lack of a genuine issue of material fact with respect to the elements of a false or fraudulent claim and presentment, as well as the materiality requirement. A genuine issue remains for trial, however, with respect to whether defendants had "knowledge," as defined by § 3729(b)(1)-(3), of the false claims they caused Madison to submit to Medicaid. Therefore, the sole issue remaining for trial on the United States' § 3729(a)(1) cause of action is whether defendants had knowledge of, were deliberately ignorant to, or recklessly disregarded the fact that Madison was billing and receiving reimbursement from Medicaid for services rendered by defendants' aides or assistants.

On its cause of action under § 3729(a)(2) for fiscal years 2003 to 2007, the United States has also proven the lack of a genuine issue of material fact with respect to the false or fraudulent claim element and materiality requirement. The only two issues remaining for trial on its § 3729(a)(2) cause of action are thus whether defendants had "knowledge," as defined by § 3729(b)(1)-(3), of the false claims they caused Madison to submit to Medicaid and whether defendants caused a false statement to be made or used "to get a false or fraudulent claim paid or approved by the Government."

IT IS THEREFORE ORDERED that

1     (1) the United States' Motion for Leave to File
2 Complete Legislative History to Supplement Defendants' Post-
3 Hearing Filing be, and the same hereby is, GRANTED;
4     (2) the United States' motion for partial summary
5 judgment on its causes of action under §§ 3729(a)(1) and (2) for
6 fiscal years 2003 to 2007 be, and the same hereby is, DENIED; and
7     (3) defendants' cross-motion for partial summary
8 judgment be, and the same hereby is, DENIED as moot.
9     Pursuant to the provisions of Rule 56(d) of the Federal
10 Rules of Civil Procedure, the court determines that the elements
11 of a false or fraudulent claim and presentment and the
12 materiality requirement on the United States' cause of action
13 under § 3729(a)(1) and the element of a false or fraudulent claim
14 and the materiality requirement on its cause of action under §
15 3729(a)(2) for fiscal years 2003 to 2007 have been established
16 and are not genuinely at issue.
17 DATED:  March 10, 2010

19 _____
   WILLIAM B. SHUBB
20 UNITED STATES DISTRICT JUDGE